UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

S.R.I.,

Petitioner,

v.

CHRISTOPHER J. LAROSE, Warden, Otay Mesa Detention Center; DANIEL BRIGHTMAN, Field Office Director, San Diego Field Office, United States Immigration and Customs Enforcement; DAVID J. VENTURELLA, Acting Director, United States Immigration and Customs Enforcement; MARKWAYNE MULLIN, Secretary of Homeland Security; TODD BLANCHE, Acting United States Attorney General, in their official capacities,

Respondents.

Case No.: 3:26-cv-04547-LEK-MMP

**ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS AND DENYING AS MOOT PETITIONER'S REQUEST FOR LEAVE TO SUPPLEMENT AND FOR LIMITED DISCOVERY**

Before this Court is Petitioner S.R.I.'s ("Petitioner") Petition for Writ of Habeas Corpus ("Petition"), filed on August 7, 2026. [Dkt. no. 1.] The respondents, identified in the Petition as Christopher J. LaRose, Warden, Otay Mesa Detention Center; Daniel Brightman, Field Office Director, San Diego Field Office, United States Immigration and Customs Enforcement ("ICE"); David J. Venturella, Acting Director, ICE; Markwayne Mullin, Secretary of Homeland Security; and Todd Blanche, Acting United States Attorney General, in their official capacities ("Respondents"), filed a Return to Petition for Writ of Habeas Corpus ("Return") on August 25, 2026. [Dkt.

no. 6.] Petitioner filed a Traverse in Support of Petition for Writ of Habeas Corpus ("Traverse") on September 1, 2026. [Dkt. no. 7.]

On September 16, 2026, Petitioner filed a Supplemental Brief in Support of Petition for a Writ of Habeas Corpus ("9/16 Supplement"). [Dkt. no. 8.] The 9/16 Supplement requested that, *inter alia*, this Court grant Petitioner leave to supplement the Petition and to conduct limited discovery as described in the 9/16 Supplement. See id. at 1-3. Respondents filed a Response to Supplemental Brief in Support of Petition for Writ of Habeas Corpus on September 28, 2026. [Dkt. no. 10.]

The Petition is granted in part and denied in part for the reasons set forth below. The requests in the 9/16 Supplement are denied as moot.

## BACKGROUND

Petitioner, a native of Ethiopia, entered the United States on May 5, 2026. See Petition at ¶ 1; id., Exh. A (Confidential Declaration of S.R.I. ("S.R.I. Decl.")) at ¶ 14.[1] Petitioner claims to have fled Ethiopia in fear of his life because he was being targeted and harassed by an Ethiopian government official and the official's family. See id., Exh. A at ¶¶ 5-8. Before Petitioner's father died in September 2024, Petitioner's father and his father's friend, Hassan, helped Petitioner acquire a passport. Petitioner does not recall seeing the form his father and Hassan submitted to obtain the passport. See id. at ¶ 10. Petitioner does recall, however, that upon seeing the passport for the first time, he realized that the passport did not have an accurate age for Petitioner, which he admits "worried" him. See id. at ¶ 11. Petitioner asserts that, when he asked Hassan about the inaccurate age, Hassan responded "if you're not an adult you need someone to travel with you to leave the country." [Id.] Although the passport did not have a visa in it when

[1] PageID.46 of Exhibit A is the Certificate of Sight Translation to the S.R.I. Declaration.

he saw it for the first time, when Hassan gave the passport to Petitioner later, it had a visa to Mexico in it. [Id. at ¶ 12.]

Petitioner left Ethiopia on February 14, 2026. Along with the passport, Petitioner traveled with a copy of his birth certificate and an Ethiopian identification card. Hassan helped Petitioner acquire the identification card a few days before Petitioner's departure. Petitioner used the passport to fly to Thailand and Mexico. After spending two months in Mexico, Petitioner relied on smugglers to help him enter the United States. Petitioner asserts that a smuggler confiscated his passport before Petitioner crossed into the United States. See id. at ¶ 13.

On May 6, 2026, an immigration officer encountered and detained Petitioner, transferred him to Brown Field Border Patrol Station ("Brown Field Station"), confiscated his birth certificate and Ethiopian identification card, and placed him in a holding room. See id. at ¶ 14; Return, Exh. 1 (redacted U.S. Department of Homeland Security ("DHS") Record of Deportable/Inadmissible Alien, Form I-213, dated 5/7/26 ("Form I-213")) at 3. While at the Brown Field Station, Petitioner asserted to immigration officers that he was a minor. Relying on information contained in Petitioner's birth certificate, the immigration officers began to process Petitioner as a minor. See Return, Exh. 1 (Form I-213) at 3; see also Petition, Exh. C (redacted S.R.I.'s Birth Certificate ("S.R.I. Birth Certificate")).[2] Petitioner asserts that his birth certificate and Ethiopian identification card show his date of birth on the Ethiopian calendar and the Gregorian calendar. See Petition, Exh. A (S.R.I. Decl.) at ¶ 14; id., Exh. C at PageID.50; id., Exh. D at PageID.54 (front side of redacted S.R.I.'s National Digital ID Card); see also Petition at ¶ 28 ("In the Ethiopian calendar, S.R.I.'s year of birth is 2001 but in the

---

[2] PageID.50 of Exhibit C is the S.R.I. Birth Certificate, and PageID.51 is a redacted English translation of the S.R.I. Birth Certificate, and PageID.52 is the Certificate of Translation.

Gregorian calendar, the one we use in the United States, his year of birth is 2009, making him 17 years old." (citation omitted)).

During Petitioner's processing, the immigration officers uncovered information concerning the date of birth on Petitioner's visa, which suggested that Petitioner was not a minor. See Return, Exh. 1 (Form I-213) at 3. Petitioner asserts that he attempted to explain to the immigration officers that the date of birth on his passport was incorrect and that the smuggler who helped Petitioner enter the United States confiscated the passport. Petitioner also asserts that he attempted to communicate with the officers through a translation application, but Petitioner suspects that the application contained many errors. See Petition, Exh. A (S.R.I. Decl.) at ¶ 14. On May 7, 2026, while in DHS custody, Petitioner was reprocessed as an adult and was placed in expedited removal proceedings pursuant to the Immigration and Nationality Act ("INA"), Title 8 United States Code Section 1225(b)(1). See Return, Exh. 1 (Form I-213) at 4; Petition at ¶¶ 43, 54; see also Return, Exh. 2 at PageID.201 (DHS Notice and Order of Expedited Removal, Form I-860, dated 5/7/26 ("Form I-860")).

Respondents assert that, during his detention at Brown Field Station, Petitioner admitted that he was born in 2000. See Return at 2; see also id., Exh. 1 (Form I-213) at 4 ("[Petitioner] was questioned again . . . and admitted that he was twenty-five years old."). Petitioner, however, asserts that he continued to state that he was a minor throughout his detention and attempted to explain to the officers that the Ethiopian calendar was different from the Gregorian calendar. See Petition, Exh. A (S.R.I. Decl.) at ¶ 14 ("Every time they asked my age, I told them honestly that I was seventeen and that I was born in 2009."); id. at ¶ 15 ("I told them that the Ethiopian calendar was different."). Petitioner also asserts that the immigration officers pressured him to lie about his date of birth, threatened to send him to jail unless he told the officers that he was an adult, and shackled his hands and feet together. See id. at ¶¶ 15-17. At some point after being taken into custody, Petitioner was moved to the Otay Mesa

Detention Center ("OMDC"). See id. at ¶ 17. Petitioner asserts that OMDC is an adult detention facility and that he has been detained at OMDC through the filing of the Petition. See Petition at ¶ 1.

While Petitioner was at OMDC, ICE officers informed him that he was being sent to a dentist, which Petitioner assumed was related to a toothache he was experiencing. While at the dentist, Petitioner was asked to sign a form and then underwent a dental examination that involved an x-ray. Petitioner claims that a translator was present at the dental examination, but that, despite the translator, he did not fully understand the form he was asked to sign. See Petition, Exh. A (S.R.I. Decl.) at ¶ 19. After the dental examination, Petitioner asserts that he was placed in isolation for nine days, and that following the period of isolation, an individual informed Petitioner that he had been determined to be an adult. See id. at ¶¶ 20-21. Petitioner claims that, when he asked ICE officers about his age determination, they responded that the dentist had determined Petitioner was over the age of eighteen. See id. at ¶ 22; see also Return, Exh. 4 (Dental Age Assessment Report by David R. Senn, DDS, D-ABFO ("Dr. Senn"), dated 5/11/26 ("Dental Report")).

While in custody, Petitioner expressed fear about the possibility of returning to Ethiopia. See Petition at ¶ 43. Accordingly, Petitioner was interviewed on July 16, July 21, and July 30, 2026 by United States Citizenship and Immigration Services ("USCIS") asylum officers without his attorney being present. See Return, Exh. 2 at PageID.214-16 (redacted USCIS Interview Notes for 7/16/26 interview by Officer M Reheman ("7/16/26 Interview Notes")); id. at PageID.217-26 (redacted USCIS Interview Notes for 7/21/26 interview by Officer E Sun); id. at PageID.227-37 (redacted USCIS Interview Notes for 7/30/26 interview by Officer "ZAP 048"). Petitioner received a negative credibility determination, and USCIS concluded that Petitioner failed to present any non-testimonial evidence establishing Petitioner's credible fear of persecution or torture. See id. at PageID.238-41 (redacted USCIS Credible Fear

Determination Checklist and Written Analysis by Officer "ZAP 048," dated 7/30/26 ("Credible Fear Determination")). Petitioner's testimony was found to not be credible because, *inter alia*, the USCIS asylum officer indicated that during his July 21, 2026 interview, Petitioner testified that he was born in 2000, but that during his July 30, 2026 interview, Petitioner testified that he was born in 2009. See Return, Exh. 2 at PageID.239 (pg. 2 of Credible Fear Determination). The asylum officer's notes for Petitioner's July 16, 2026 interview also state that Petitioner indicated to the asylum officer that he was born in 2000. See id. at PageID.214 (pg. 1 of 7/16/26 Interview Notes).

Petitioner remembers the July 2026 USCIS interviews differently. He denies having told any asylum officer that he was born in 2000. See Petition, Exh. A (S.R.I. Decl.) at ¶ 32 ("I had another interview on July 30, 2026 without my attorney. This time the interviewer asked me about my age. He asked why I said I was 25 years old in the first interview. I said I swear to god I never said I was 25. I said I was 17, born on [redacted] 2009."). Petitioner also states that, during his July 30, 2026 interview, he explained to the asylum officer that immigration officials threatened to send him to jail unless he asserted that he was twenty-five, but that he continued to insist he was seventeen. [Id.] Petitioner requested that an immigration judge review USCIS's determination that he does not have a credible fear of persecution or torture. See Return, Exh. 2 at PageID.193 (pg. 2 of USCIS Record of Negative Credible Fear Finding and Request For Review by Immigration Judge, Form I-869, dated 8/4/26).

On August 19, 2026, Respondents provided Petitioner the DHS Memorandum of Investigation – Age Assessment, Form G-166C, also dated August 19, 2026 ("Form G-166C"). See Traverse at ¶ 1; see also Return, Exh. 3 (Form G-166C). The Form G-166C sets forth a determination by ICE Enforcement and Removal Operations ("ICE ERO") that Petitioner was an adult when he entered the United States. See Return, Exh. 3 at 3. On a date not stated in the record, an immigration judge denied Petitioner's

request to vacate the age determination and the negative credible fear determination. See Traverse at ¶ 4 & n.2.

Petitioner alleges that his detention violates Section 235 of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), Title 8 United States Code Section 1232; [Petition at pgs. 24-26;] the Administrative Procedure Act ("APA"), Title 5 United States Code Section 706; [id. at pgs. 26-31;] and his Fifth Amendment right to due process, [id. at pgs. 31-34]. Petitioner also claims that his detention violates the Flores Settlement Agreement.[3] See id. at pg. 26.

Petitioner asks this Court to, *inter alia*: 1) issue a writ of habeas corpus ordering Respondents to immediately transfer Petitioner from their custody to the custody of Petitioner's sponsor, or, in the alternative, issue an order directing Respondents to transfer Petitioner to Office of Refugee Resettlement ("ORR") custody with instructions concerning Petitioner's release to his sponsor;[4] 2) issue an order prohibiting Respondents from detaining Petitioner in adult custody; 3) issue a declaratory judgment that Petitioner's detention violates the TVPRA, the Flores Settlement Agreement, and the Fifth Amendment; 4) vacate Respondents' age determinations as unlawful; 5) award

---

[3] The Flores Settlement Agreement is "a 1997 settlement agreement between the United States and a class of all minors subject to immigration detention." Flores v. Rosen, 984 F.3d 720, 726 (9th Cir. 2020). The class of minors was a nationwide class. See Perez-Funez v. Dep't of Homeland Sec., Case No. CV 81-01457-MWF (Ex), 2026 WL 982623, at *1 (C.D. Cal. Apr. 6, 2026). The Flores Settlement Agreement "established nationwide standards for the detention, release, and treatment of minors by U.S. immigration authorities." Flores, 984 F.3d at 726 (citation and internal quotation marks omitted).

[4] Petitioner asserts that "Aden, a friend of S.R.I.'s father living in Minnesota, is ready to sponsor S.R.I. in the United States." [Petition at ¶ 48 (citing id., Exh. A (S.R.I. Decl.) at ¶ 34).]

Petitioner attorney's fees and costs; and 6) grant any other appropriate relief. See id. at pg. 35.

Respondents request that this Court dismiss the Petition without prejudice for failure to state a claim. See Return at 2. Respondents assert that they complied with applicable statutory and regulatory procedures in determining Petitioner's age as evidenced by the Form G-166C. See id. at 3-4. They argue that Petitioner has failed to exhaust his administrative remedies, and that such failure warrants dismissal, or, in the alternative, a stay. See id. at 5. Respondents also argue that Petitioner is subject to mandatory detention under Title 8 United States Code Section 1225(b)(1), and he has failed to establish a due process violation. See id. at 6.

## STANDARD

A federal prisoner challenging the execution of his or her sentence, rather than the legality of the sentence itself, may file a petition for writ of habeas corpus in the district of his confinement pursuant to Title 28 United States Code Section 2241. See 28 U.S.C. § 2241(a); Zavala v. Ives, 785 F.3d 367, 370 n.3 (9th Cir. 2015). The sole judicial body able to review challenges to final orders of deportation, exclusion, or removal is the court of appeals. See 8 U.S.C. § 1252(a)(1), (5); see also Alvarez-Barajas v. Gonzales, 418 F.3d 1050, 1052 (9th Cir. 2005) (citing REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, § 106(a)). However, for claims challenging ancillary or collateral issues arising independently from the removal process - for example, a claim of indefinite detention - federal habeas corpus jurisdiction remains in the district court. See Alvarez v. Sessions, 338 F. Supp. 3d 1042, 1047-48 (N.D. Cal. 2018) (citations omitted); see also Nadarajah v. Gonzales, 443 F.3d 1069, 1076 (9th Cir. 2006).[5]

[5] Nadarajah was abrogated on other grounds by Jennings v. Rodriguez, 583 U.S. 281, 138 S. Ct. 830 (2018), as recognized by Esquivel-Ipina v. LaRose, 812 F. Supp. 3d 1073, 1077 (S.D. Cal. 2025).

# DISCUSSION

## I. Exhaustion

First, this Court turns to Respondents' argument that Petitioner has failed to exhaust his administrative remedies. See Return at 4-5.

> While administrative exhaustion is not a jurisdictional requirement for habeas petitions filed under 28 U.S.C. § 2241, courts typically "require that habeas petitioners exhaust all available judicial and administrative remedies before seeking relief under § 2241" as a "prudential matter." Ward v. Chavez, 678 F.3d 1042, 1045 (9th Cir. 2012). "Courts may require prudential exhaustion if (1) agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision; (2) relaxation of the requirement would encourage the deliberate bypass of the administrative scheme; and (3) administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review." Puga v. Chertoff, 488 F.3d 812, 815 (9th Cir. 2007) (internal citations and quotations omitted). Because exhaustion is not jurisdictional, courts "have discretion to waive a prudential requirement." Laing v. Ashcroft, 370 F.3d 994, 998 (9th Cir. 2004). A court may waive the exhaustion requirement when "administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void." Id. at 1000 (internal quotations and citations omitted).

Miguel Pedro v. Mullin, Case No. 5:26-cv-04303-MBK, 2026 WL 2677303, at *4 (C.D. Cal. Sept. 11, 2026).

Respondents assert that "Petitioner has not sought review of the age determination in immigration court." [Return at 5.] However, as Petitioner points out, "[t]here is no appeal process for age determination." [Traverse at ¶ 3.] Petitioner also states that he attempted to appeal the age determination before an immigration judge during a hearing to vacate Petitioner's negative credible fear determination and that such efforts were futile. See id. at ¶ 4. Further, Respondents assert Petitioner is subject to an expedited removal order. See Return at 5; id., Exh. 2 at PageID.201 (Form I-860). Here,

Petitioner is not challenging his removal order and, even if he were, this Court does not have jurisdiction to review an expedited removal order nor can an immigration judge review an expedited removal order. See United States v. Barajas-Alvarado, 655 F.3d 1077, 1082 (9th Cir. 2011) ("Congress expressly deprived courts of jurisdiction to hear a direct appeal from an expedited removal order." (citing 8 U.S.C. § 1252(a)(2)(A))); Bolivar v. Mullin, Case No. 2:26-cv-02951-TLF, 2026 WL 2661464, at *1 (W.D. Wash. Sept. 10, 2026 ("Noncitizens covered by § 1225(b)(1) are subject to an expedited removal process that does not include a hearing before an Immigration Judge or review of the removal order." (citation omitted)). Petitioner is also not asking this Court to make an age determination itself. See Traverse at ¶ 3. Therefore, this Court concludes Petitioner has sufficiently demonstrated that exhaustion of administrative remedies would be futile. Respondents' request to dismiss or stay the Petition on exhaustion grounds is therefore denied.

## II. Age Determination

### A. Statutory and Regulatory Background

This district court has previously stated:

> United States Magistrate Judge James P. Donohue provided a thorough overview of the legal framework relevant to the instant Petition in B.I.C. v. Asher, No. C16-132-MJP-JPD, 2016 WL 8672760 (W.D. Wash. Feb. 19, 2016):
>
> > Before the creation of DHS in 2002, the care and placement of unaccompanied alien children ("UAC") in the United States was the responsibility of the Office of Juvenile Affairs in the former Immigration and Naturalization Service ("INS"). See F.L. v. Thompson, 293 F. Supp. 2d 86, 96 (D.D.C. 2003). In 2002, INS's functions were split between the enforcement of federal immigration law, which was left to DHS, and the care of immigrant children, which was left to [the U.S. Department of Health and Human Services ("HHS")]. See Homeland Security Act, Pub. L. No. 107-296, 116 Stat. 2135 (2002) ("HSA"). Those laws were amended again in 2008 through the William

Wilberforce Trafficking Victims Protection Act ("TVPRA"), further separating DHS's and HHS's functions by placing the care and custody of children under HHS's jurisdiction and clarifying the respective roles and responsibilities of the two agencies with respect to UACs.

### A. The Homeland Security Act of 2002

With the enactment of the HSA, Congress created DHS and transferred most immigration functions formerly performed by INS to DHS and its components, including U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, and ICE. See HSA; Department of Homeland Security Reorganization Plan Modification of January 30, 2003, H.R. Doc. No. 108-32 (2003) (also set forth as a note to 6 U.S.C. § 542). Notably, Congress transferred to [ORR] the responsibility for the care of any UAC "who [is] in Federal custody by reason of [his or her] immigration status." 6 U.S.C. §§ 279(a), (b)(1)(A). The HSA also transferred to ORR the responsibility for making all placement decisions for UACs, required ORR to coordinate these placement decisions with DHS, and required ORR to ensure that UACs are not released upon their own recognizance. See 6 U.S.C. §§ 279(b)(1)(C), (D), (b)(2).

### B. The Trafficking Victims Protection Reauthorization Act of 2008

The TVPRA, which was signed into law on December 23, 2008, contains statutory protections relating to UACs and codified protections related to the processing and detention of UACs. The TVPRA built on the split of duties in the HSA and further requires that "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of Health and Human Services." 8 U.S.C. § 1232(b)(1). It also provides that in most instances, "any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to the Secretary of Health and Human Services not later than 72 hours

> after determining that such child is an unaccompanied alien child." 8 U.S.C. § 1232(b)(3).
>
> The TVPRA makes clear that HHS is responsible for all placement decisions for UACs in its custody, and for conducting suitability assessments for those placements. 8 U.S.C. § 1232(c). It requires that UACs in HHS custody be "promptly placed in the least restrictive setting that is in the best interest of the child," and it provides guidelines for the reunification of UACs with their families by HHS. 8 U.S.C. § 1232(c)(2), (3).
>
> The protections TVPRA affords UACs apply after the HHS, in consultation with DHS, determines that the applicant is indeed a child. 8 U.S.C. § 1232(b)(a) [sic]. . . .

N.B. v. Barr, Case No.: 19-CV-1536 JLS (LL), 2019 WL 4849175, at *1-2 (S.D. Cal. Oct. 1, 2019) (some alterations in N.B.).

The TVPRA mandates that the Secretary of HHS, in consultation with the Secretary of DHS, "develop procedures to make a prompt determination of the age of an alien," which are to be used by both DHS and HHS for children in their respective custody. 8 U.S.C. § 1232(b)(4). The TVPRA further directs that, "[a]t a minimum, these procedures shall take into account multiple forms of evidence, including the non-exclusive use of radiographs, to determine the age of the unaccompanied alien." Id. To that end, "HHS and DHS worked jointly to develop . . . age determination policies and procedures." ORR Unaccompanied Alien Children Bureau Policy Guide: Section 1 ("ORR Guide"), https://acf.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-1#1.6 at § 1.6: Determining the Age of an Individual without Lawful Immigration Status (Revised Aug. 1, 2024), *available at* https://perma.cc/3K4R-ZJFK.

The ORR Guide states that HHS may conduct age determinations for detained individuals where there is a reasonable suspicion that the individual is eighteen

years of age or older. See ORR Guide § 1.6.1. Where there is conflicting evidence concerning an individual's age, an HHS-funded care provider case worker notifies a Federal Field Specialist who then makes an age determination after reviewing the evidence collected by the care provider. Id.

The ORR Guide states:

> Procedures for determining the age of an individual **must take into account the totality of the circumstances and evidence**, including the non-exclusive use of radiographs, to determine the age of the individual. ORR may require an individual in ORR custody to submit to a medical or dental examination, including X-rays, conducted by a medical professional or to submit to other appropriate procedures to verify their age. If ORR subsequently determines that such an individual is an unaccompanied alien child, the individual will be treated in accordance with ORR's UAC Bureau regulations.
>
> ORR considers multiple forms of evidence in making age determinations, and determinations are made based upon a totality of evidence. ORR may consider information or documentation to make an age determination, including but not limited to:
>
> 1. Documentation:
>
>    - Official government-issued documents, including birth certificates. If there is no original birth certificate, certified copy, photocopy or facsimile copy of a birth certificate acceptable to ORR, ORR consults with the consulate or embassy of the individual's country of birth to verify the validity of the birth certificate presented.
>
>    - Authentic government-issued documents issued to the bearer.
>
>    - Other documentation, such as baptismal certificates, school records, and medical records, that indicate the unaccompanied alien child's date of birth.

2. Statements by individuals (including the unaccompanied alien child) determined to have personal knowledge of the unaccompanied alien child's age and who HHS concludes can credibly attest to the age of the unaccompanied alien child:

- Statements provided by the unaccompanied alien child regarding their age or birth date. (An unaccompanied alien child's uncorroborated declaration regarding age is not used as the sole basis for an age determination.)

- Sworn affidavits from parents or other relatives as to the individual's age or birth date, if such persons can be identified and contacted.

- Statements from parents or legal guardians

- Statements from other persons apprehended with the individual.

- Statements from other persons.

- Information from another government agency (Federal, State, local or foreign)

- State/local arrest records.

- Child welfare agency records.

3. Medical Age Assessments:

Medical Age Assessments include both the use of imaging technology, such as radiography, and physical examinations.

Regarding these assessments:

- Medical age assessments should not be used as a sole determining factor but only in concert with other factors.

- A medical professional experienced in age assessment method(s) must perform the examination, taking into account the individual's ethnic and genetic background.

- **Dental maturity assessments using radiographs may be used to determine age, but only in conjunction with other evidence**.

- As no current medical assessment method can determine an exact age, best practice relies on the estimated probability that an individual is 18 or older. The examining doctor must submit a written report indicating the probability percentage that the individual is a child or an adult.

- The ORR/Federal Field Specialist (FFS) supervisor must review the determination regarding the age submitted by the examining doctor.

- If an individual's estimated probability of being 18 or older is 75 percent or greater according to a medical age assessment, and this evidence has been considered in conjunction with the totality of the evidence, ORR must determine that the individual is 18 years or older and may refer the individual to the U.S. Department of Homeland Security (DHS). . . .

Id. § 1.6.2 (emphases added and original emphases omitted). With this framework in mind, this Court turns to the parties' arguments concerning Petitioner's TVPRA and related claims.

**B. Analysis**

This Court, confronted with a petition with similar factual and legal issues, previously stated:

> At the outset, the Court emphasizes the limited nature of the issues before it. Petitioner's claims, as relevant here, do not require the Court to review a final order of removal, decide Petitioner's eligibility for immigration relief, or make a factual determination

> regarding Petitioner's age. Rather, Petitioner challenges Respondents' decision to continue detaining him based upon an age determination that Petitioner alleges was not made in compliance with statutory and regulatory procedures. The instant action is a challenge to Petitioner's present detention, and it is therefore properly considered under Section 2241. See V.V. v. Orozco, Civ. No. 20-560 KG/CG, 2020 WL 3542480, at *6 (D.N.M. June 30, 2020) (distinguishing between a request that the district court declare the petitioner a UAC and a request that DHS be enjoined from applying an age determination that allegedly violated § 1232(b)(4)); Alam v. Keeton, No. CV-19-05538-PHX-MTL (CDB), 2020 WL 5439513, at *6 (D. Ariz. Sept. 9, 2020) ("The Court has habeas corpus jurisdiction to review this claim because it challenges ICE's detention authority, not its discretionary decision to detain, rather than release, Petitioner. While it precludes this Court from reviewing ICE's discretionary weighing of evidence and decision, 8 U.S.C. § 1226(e) does not bar review of whether ICE complied with the requirements established by § 1232(b)(4) in order to exercise its detention authority." (citing Jennings, 138 S. Ct. at 841)). Petitioner "carries the burden of proving by a preponderance of the evidence that he is entitled to habeas relief." See Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004) (citation omitted).
>
> The Court, therefore, does not determine Petitioner's actual date of birth or whether Petitioner is, or was, a UAC for purposes of his removal proceedings or any application for immigration relief. The question before the Court is narrower: whether Petitioner has shown that Respondents failed to comply with relevant statutes and regulations when they determined, upon Petitioner's detention, that he was an adult and subsequently placed him in an adult detention facility.

Y.A.A. v. LaRose, Case No. 3:26-cv-03071-LEK-VET, 2026 WL 1881585, at *6 (S.D. Cal. June 30, 2026) ("Y.A.A. 6/30 Order") (some citations omitted).[6] The same is true in the instant action. Specifically, the question before this Court is whether Petitioner has

---

[6] In the Y.A.A. 6/30 Order, this Court directed the respondents to provide the petitioner with a written age determination that complied with the TVPRA and its implementing regulations. See 2026 WL 1881585 at *10.

shown that Respondents failed to comply with the relevant statutes and regulations when they determined that Petitioner was an adult and continued to detain him in an adult detention facility. Petitioner has made that showing.

Section 1232(b)(4) requires that age-determination procedures "take into account multiple forms of evidence, including the non-exclusive use of radiographs." 8 U.S.C. § 1232(b)(4). The ORR Guide similarly provides that age determinations "must take into account the totality of the circumstances and evidence," and that dental maturity assessments using radiographs may be used only "in conjunction with other evidence." ORR Guide § 1.6.2. Under these procedures, "each case must be evaluated carefully based on the totality of all available evidence, including the statement of the individual in question." Id. § 1.6.

The record here contains a written age determination. Compare Return, Exh. 3 (Form G-166C), with Y.A.A. 6/30 Order, 2026 WL 1881585, at *7 (noting that the record did not contain a written DHS, HHS, or ORR age determination). Respondents argue that the Form G-166C demonstrates that they complied with the applicable statutory and regulatory procedures. See Return at 3-4. The Form G-166C does identify a range of evidence that ICE ERO reviewed, including, *inter alia*, the Dental Report, various documents such as Petitioner's birth certificate, and Petitioner's alleged statements to immigration officers. See Return, Exh. 3. Once Respondents have complied with Section 1232(b)(4) and the applicable agency procedures, this Court may not review their discretionary weighing of the evidence or their ultimate decision. See Y.A.A. v. LaRose, Case No. 3:26-cv-03071-LEK-VET, 2026 WL 2851655, at *3 (S.D. Cal. Sept. 22, 2026) ("Y.A.A. 9/22 Order") ("While Petitioner may disagree with Respondents' determination that he was an adult when he entered the United States, the Court, having determined that Respondents have complied with their statutory and regulatory requirements, is precluded from reviewing Respondents' discretionary weighing of the totality of the evidence and their ultimate decision." (citation omitted)).

An age determination does not comply with Section 1232(b)(4), however, by simply cataloging the evidence that was before ICE ERO. See, e.g., A.D. v. Mullin, 3:26-CV-00983-MJH, 2026 WL 1983137, at *4 (W.D. Pa. July 9, 2026) (concluding that the respondents did not consider the totality of the evidence where neither of two age re-determination memoranda, one of which listed twenty-five items considered, reflected consideration of sworn declarations from the petitioner's family members or state family court orders); I.J. v. Keeton, No. CV-19-01904-PHX-SMB (JZB), 2019 WL 13196148, at *7 (D. Ariz. Apr. 17, 2019) (concluding that, "[b]y failing to document the evidence considered and conclusions reached in the age determination," the respondents failed to satisfy their obligations under the TVPRA). The question this Court must resolve is whether Respondents properly considered the evidence before them, or whether their review was perfunctory and relied on considerations that the TVPRA and the ORR Guide do not permit. See, e.g., N.B., 2019 WL 4849175, at *10-12. The Form G-166C falls short in several respects.

The Form G-166C was prepared well after Respondents began treating Petitioner as an adult. Petitioner was reprocessed as an adult on May 7, 2026. That happened after immigration officers uncovered information about the date of birth on his passport and questioned him further. See Return, Exh. 1 (Form I-213) at 3-4. The Form G-166C is dated August 19, 2026, twelve days after Petitioner filed the Petition. See Return, Exh. 3 (Form G-166C) at 1. This Court considers the Form G-166C because it is the age determination on which Respondents now rely.[7] This Court notes, however,

---

[7] Petitioner argues that this Court should not consider the Form G-166C because it is a *post hoc* rationalization prepared after this action began, and therefore violates the principle promulgated by the United States Supreme Court in Securities and Exchange Commission v. Chenery Corp., 318 U.S. 80, 95 (1943), and its progeny. See Traverse at ¶¶ 6-11. This Court does not need to address this argument, because it concludes that,

(. . . continued)

that the record does not contain a written age determination that Respondents relied upon during the period from May 7, 2026 to August 19, 2026. Cf. N.B., 2019 WL 4849175, at *10 (rejecting the respondents' "post hoc justifications on alternative bases for their age determination").

First, the Form G-166C relies heavily on the passport Petitioner used to travel to the United States, which purportedly states that Petitioner was born in 2000.[8] ICE ERO found it relevant that the passport "allowed [Petitioner] to travel freely between countries without issue." See Return, Exh. 3 at 3. Petitioner explains, however, that Hassan obtained the passport with an incorrect date of birth because, without an adult date of birth, Petitioner could not leave Ethiopia. See Petition, Exh. A (S.R.I. Decl.) at ¶¶ 10-11. Although ICE ERO was aware of that explanation, see Return, Exh. 3 at 1, the Form G-166C relies on Petitioner's use of the passport as corroboration of an adult date of birth without addressing Petitioner's explanation for that very use. See Akinmade v. INS, 196 F.3d 951, 955 (9th Cir. 1999) ("[I]n the circumstance of a refugee fleeing persecution, such misrepresentations are wholly consistent with his testimony and application for asylum: he did so because he feared deportation to [his country of origin]." (some alterations in Akinmade) (citation and internal quotation marks omitted)); N.B., 2019 WL 4849175, at *10 (concluding that the respondents impermissibly relied on a false birthdate the petitioner used "only to avoid being detained or deported prior to reaching the United States border" (citation omitted)).

---

even if the Form G-166C is considered, it does not comply with Section 1232(b)(4) and the ORR Guide.

[8] This Court must rely on the parties' representations concerning Petitioner's passport, as a copy of the passport is not currently in the record. See Petition, Exh. A (S.R.I. Decl.) at ¶ 13 (stating the smugglers who helped Petitioner enter the United States took his passport shortly before he entered the country).

This Court does not conclude that ICE ERO was prohibited from considering the passport. See Imon v. Keeton, No. CV-20-00037-PHX-DWL (JZB), 2020 WL 4284378, at *8 (D. Ariz. July 27, 2020) ("recognizing that a particular category of evidence presents challenges isn't the same thing as forbidding any consideration of that category of evidence"). ICE ERO, however, impermissibly relied on the passport as evidence of Petitioner's age without confronting his explanation for it. Nor does the Form G-166C reflect that ICE ERO sought to verify the passport's date of birth with Ethiopian authorities. See Return, Exh. 3 (Form G-166C) at 2 (noting that ICE ERO obtained a copy of the biographic page of Petitioner's passport, with no notation of an attempt to verify the information); cf. Alam, 2020 WL 5439513, at *2 (noting that ICE asked the Bangladesh Embassy to verify the petitioner's birth certificate and to provide a copy of his passport, and that the embassy responded that the petitioner's date of birth was in 1995).

The Form G-166C's treatment of the dental assessment also raises several concerns with respect to the passport. The Form G-166C states that the forensic dentist assessed the probability that "IDIRIS" had attained eighteen years of age. [Return, Exh. 3 at 1.] It also states that the dentist estimated the mean age of a male with dental development equal to that of "IDIRIS" as 20.24 years, plus or minus 2.98 years. [Id.] Petitioner's name is not Idiris, and those figures do not match the report in the record. Dr. Senn's report estimates Petitioner's age as 20.18 years, plus or minus 2.91 years, and states an interval of possible ages of 17.27 to 23.09 years. [Return, Exh. 4 (Dental Report).] The Form G-166C therefore appears to describe a dental assessment of someone other than Petitioner. An age determination that misdescribes one of the principal pieces of evidence on which it relies does not reflect that ICE ERO actually took that evidence into account. Moreover, under the report that is actually in the record, if Petitioner was born in 2000, he would be at least twenty-five years old when the dental examination occurred. That is well above the upper end of Dr. Senn's stated interval. The

Form G-166C relies on both the passport and the dental assessment but does not acknowledge that they are inconsistent with each other. Cf. N.B., 2019 WL 4849175, at *10 n.9 (observing that the dental age assessment on which the respondents relied was inconsistent with the adult birthdate the respondents attributed to the petitioner).

Second, the Form G-166C relies on Petitioner's statements that he was born in 2000. Specifically, those are his asserted statements to immigration officers that he was twenty-five years old while detained at Brown Field Station and his statements during the July 16 and July 21, 2026 credible fear interviews. See *supra* Background Section. The Form G-166C notes some of Petitioner's explanations for those statements, but it does not explain why ICE ERO rejected those explanations. See generally Return, Exh. 3 (Form G-166C).

As to the statement to immigration officers at Brown Field Station, the Form G-166C records two explanations from Petitioner. One is that agents told him he would go to jail for eight years if he continued to say he was seventeen years old. The other is that the agents saw 2001 on his Ethiopian identification card and believed he was twenty-five. See id. at 1; see also Petition, Exh. A (S.R.I. Decl.) at ¶¶ 14-17. Petitioner asserts that his birth certificate and identification card reflect his year of birth under both the Ethiopian calendar, in which it is 2001, and the Gregorian calendar, in which it is 2009. See Petition at ¶ 28; id., Exh. A (S.R.I. Decl.) at ¶ 14. The Form G-166C repeatedly cites Petitioner's statements as evidence that he is an adult. See generally Return, Exh. 3 (Form G-166C). It does not explain why ICE ERO rejected Petitioner's assertion that the statements were coerced, and it does not mention the difference between the Ethiopian and Gregorian calendars. Cf. Y.A.A. 6/30 Order, 2026 WL 1881585, at *7 (concluding that the respondents impermissibly relied on the petitioner's statements where it was uncontroverted that the petitioner gave an adult birthdate after immigration officers told him he would be returned to his home country if he revealed that he was a child).

As to the credible fear interviews, Petitioner denies that he told the asylum officer he was born in 2000, see Petition, Exh. A (S.R.I. Decl.) at ¶ 32, but the USCIS records indicate that he did, see Return, Exh. 2 at PageID.214 (pg. 1 of 7/16/26 Interview Notes), PageID.239 (pg. 2 of Credible Fear Determination). This Court does not resolve that dispute. ICE ERO found that "[Petitioner's] explanation for claiming . . . 2009 as his true [year] of birth at the credible fear interview on July 30, 2026 is not reasonable as he never at any point in the two prior interviews testified to another [year] of birth or use [sic] the date of 2009 as his birth year." [Return, Exh. 3 (Form G-166C) at 3.] In other words, the Form G-166C considers the July 30, 2026 credible fear interview as the first instance where Petitioner asserted that his birth year is 2009. The record shows otherwise. The Form I-213 reflects that Petitioner asserted he was a minor upon his arrival at Brown Field Station, and that officers began processing him as a minor based on his birth certificate. [Return, Exh. 1 at 3.] Petitioner's sworn statement to immigration officers on May 7, 2026 shows that he asserted his year of birth is 2009. [Return, Exh. 2 at PageID.202 (pg. 1 of DHS Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act, dated 5/7/26).] The Form G-166C itself acknowledges that Petitioner presented a birth certificate and an Ethiopian identification card reflecting a year of birth of 2009. See Return, Exh. 3 at 1. In short, the Form G-166C does not account for Petitioner's assertion from the outset of his detention that 2009 was the year of his birth.

Third, ICE ERO concluded that Petitioner's copy of his original birth certificate is fraudulent by comparing it to State Department guidance describing an original Ethiopian national standard birth certificate. See id. at 2. ICE ERO faulted the document because it is not printed on gray paper and lacks watermarking and security threads. [Id.] ICE ERO also acknowledged, however, that the document it reviewed is "not an original document." [Id.] The Form G-166C does not explain why the copy's lack of "paper featuring a light gray background," as well as the watermarking and security

threads of an original birth certificate, indicates that the underlying document is fraudulent.

More fundamentally, Section 1.6.2, Paragraph 1 of the ORR Guide provides: "If there is no original birth certificate, certified copy, photocopy or facsimile copy of a birth certificate acceptable to ORR, ORR consults with the consulate or embassy of the individual's country of birth to verify the validity of the birth certificate presented." Respondents have possessed Petitioner's birth certificate since his apprehension on May 6, 2026. See Return, Exh. 1 (Form I-213) at 3. The Form G-166C, however, does not reflect any effort to verify Petitioner's birth certificate, whether through Ethiopian officials or through forensic examination, and it does not explain why no such effort was made. See Return, Exh. 3 at 1-2. To the extent that ICE ERO had doubts about the validity of the birth certificate, the consultation procedure in the ORR Guide was the means to resolve them. Compare V.V., 2020 WL 3542480, at *2 (noting that ICE contacted an officer with the Consulate of India regarding the petitioner's birth certificate and identification card), and Alam, 2020 WL 5439513, at *1-2 (noting that ORR verified the petitioner's birth certificate on the Bangladesh government's verification website and that ICE sought verification from the Bangladesh Embassy), with I.J., 2019 WL 13196148, at *7 (faulting the respondents for failing to "provide any reasons for discounting the certified birth certificate" where the ORR Guide required that home-country officials be consulted if the authenticity of the documentation was in question (citation omitted)). This Court recognizes that Petitioner asserts he fears persecution by Ethiopian government actors, see Petition, Exh. A (S.R.I. Decl.) at ¶¶ 5-8, and this Court does not prescribe how Respondents must verify Petitioner's birth certificate or other documents. Nevertheless, a finding of fraud that rests only on comparing a copy of a document to a general description of an original's security features, without any

verification or explanation, does not reflect the careful evaluation that the ORR Guide requires.[9]

ICE ERO also concluded that Petitioner's Ethiopian identification card is fraudulent "[g]iven the manner in which it was obtained and where it was obtained," namely "an office where phone sim [sic] cards are purchased." [Return, Exh. 3 (Form G-166C) at 3.] The Form G-166C does not identify any source indicating that Ethiopian identification cards are not issued at such locations.[10] It does not compare the identification card to any guidance, and it does not reflect any attempt to verify the identification card with Ethiopian authorities. See id. Without some basis in the record, the inference ICE ERO drew from the location at which the card was obtained is speculation, and Respondents "cannot rely solely on speculation" to discredit Petitioner's documents. See N.B., 2019 WL 4849175, at *10 (citing Yun Wang v. Holder, 404 F. App'x 196, 197 (9th Cir. 2010)); see also id. at *12 (concluding that the respondents "fail[ed] entirely to take into account" the petitioner's government-issued photo identification card (citation omitted)).

Fourth, the Form G-166C disposes of the remaining evidence of Petitioner's age in a single sentence. That evidence is Petitioner's declaration, an affidavit from his

---

[9] Petitioner has since filed a color copy of his birth certificate and samples of birth certificates issued in the Somali region of Ethiopia, which he contends rebut ICE ERO's findings. See Traverse at ¶¶ 36-40; id., Exh. B (Petitioner's color copy birth certificate); id., Exh. C (sample Ethiopian birth certificates from the Somali region). These materials were not before ICE ERO when it prepared the Form G-166C, and this Court does not evaluate them. They are, however, among the documentary evidence available to the parties that a determination complying with Section 1232(b)(4) should consider.

[10] Petitioner represents that Ethiopia's national identification program permits registration at sales centers of a state-owned telecommunications company. See Traverse at ¶ 33. This Court does not rely on that representation but merely notes the conclusory and speculative nature of Respondents' determination that Petitioner's Ethiopian identification card is fraudulent.

sister, a school record, an emergency department medical report, a report from a forensic odontologist, and reports from the Innocence Project and a forensic anthropologist. ICE ERO gave all of it "little or no weight." [Return, Exh. 3 (Form G-166C) at 3.] It described the evidence as a "convenient narrative," a "biased affidavit," an "uncertified school record," an Ethiopian medical report "written in the English language," and "biased reports." [Id.] ICE ERO expressly discounted this evidence "[i]n light of the unreasonable explanations made by [Petitioner]" at the July 30, 2026 credible fear interview and his statements to immigration officers at Brown Field Station. [Id.] ICE ERO's reliance on those "unreasonable explanations" is deficient for the same reasons discussed above.

The ORR Guide expressly identifies "[s]worn affidavits from parents or other relatives as to the individual's age or birth date" s as evidence that may be considered in an age determination. See ORR Guide § 1.6.2, ¶ 2. School records and medical records may also be considered. See id., ¶ 1. If Respondents can discount a notarized affidavit from a relative as biased solely because it comes from a relative, then Respondents are, in effect, unilaterally excising entire provisions of the ORR Guide. However, "[i]t is well-established that government agencies are required to follow their own regulations." Constantinovici v. Bondi, 806 F. Supp. 3d 1155, 1164 (S.D. Cal. 2025) (citing United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 268, 74 S. Ct. 499, 98 L. Ed. 681 (1954); United States v. Ramos, 623 F.3d 672, 683 (9th Cir. 2010)). The Form G-166C also does not explain why the absence of a certification undermines the school record, why the language of the medical report indicates that it is unreliable, or why the expert reports are biased. See Return, Exh. 3 at 3. An age determination that dismisses the evidence that an individual is a minor in the manner the Form G-166C does here does not reflect the careful evaluation of "the totality of all available evidence" that the procedures require. See ORR Guide § 1.6.

The Form G-166C thus differs materially from age determinations that courts have upheld. In Alam, for instance, ICE's determination rested in part on the Bangladesh Embassy's confirmation that the petitioner held a passport issued in 2017 listing a 1995 date of birth. See Alam, 2020 WL 5439513, at *2, *7. In C.T.M. v. Moore, No. 3:20-cv-540-B (BT), 2020 WL 5919737 (N.D. Tex. July 1, 2020), the agency official analyzed each of the petitioner's documents and identified specific internal inconsistencies, such as report cards indicating that the petitioner attended school at the ages of one and two. See id. at *4-7.[11] Here, ICE ERO's evidence of Petitioner's adulthood consists of three things. The first is a passport that Petitioner explains was obtained with an incorrect date of birth so that he could leave Ethiopia. The second is statements that Petitioner says were coerced or that he denies making. The third is a dental assessment that "cannot substitute for the totality-of-the-evidence inquiry required by the TVPRA." See Y.A.A. 6/30 Order, 2026 WL 1881585, at *8 (some citations omitted) (citing 8 U.S.C. § 1232(b)(4); ORR Guide § 1.6.2).[12] This Court concludes that

[11] The district judge adopted the magistrate judge's report and recommendation. C.T.M., 2020 WL 4333365 (July 28, 2020).

[12] This Court notes that, *inter alia*, Petitioner argues that Dr. Senn's assessment did not take into account Petitioner's ethnic and genetic background, because it compared Petitioner's molar development to reference data drawn from a different population. See Petition at ¶¶ 82-91; Traverse at ¶ 54. The ORR Guide provides that "[a] medical professional experienced in age assessment method(s) must perform the examination, taking into account the individual's ethnic and genetic background." ORR Guide § 1.6.2, ¶ 3; see also V.V., 2020 WL 3542480, at *9 (concluding, in the context of a motion for a temporary restraining order, that the petitioner was likely to succeed on the merits where the skeletal age examination did not state, among other things, whether the petitioner's ethnic and genetic background was considered). Respondents do not address to this argument. See generally Return. This Court does not decide whether Dr. Senn's assessment complies with the ORR Guide's requirements. This Court notes only that Petitioner raises a question the ORR Guide makes relevant to an age determination, and that Respondents do not address it.

the evidence supporting Petitioner's claimed age was rejected without the procedures the ORR Guide contemplates.

This Court's conclusion is consistent with its decision in the Y.A.A. 9/22 Order, 2026 WL 2851655. There, this Court had previously identified specific evidence that ICE ERO was required to consider. Id. at *1-2 (citing Y.A.A. 6/30 Order, 2026 WL 1881585). ICE ERO considered that evidence and explained, as to the evidence it discounted, either that the evidence bore indicia of fraud or that it did not directly address the petitioner's claimed date of birth. See id. at *2. This Court concluded that ICE ERO had complied with the TVPRA and its implementing procedures and, having so concluded, declined to review ICE ERO's weighing of the evidence. See id. at *2-3. This Court did not rule that an age determination complies with Section 1232(b)(4) whenever it recites the evidence before ICE ERO. Compliance with the TVPRA and its implementing regulations is the threshold question, and the bar on reviewing ICE ERO's weighing of evidence applies only once that threshold is met. See id. at *3.

Here, the threshold is not met. The Form G-166C's description of the dental assessment on which it relies is inaccurate. Its fraud finding as to Petitioner's identification card rests on an unexplained assumption, and its fraud finding as to his birth certificate rests on a comparison that does not account for the document being a copy. It relies on Petitioner's passport and prior statements without addressing his explanations for them. Those are failures to take the evidence into account, not choices about how to weigh the evidence.

Accordingly, this Court concludes that Respondents did not comply with Section 1232(b)(4) and the ORR Guide in determining that Petitioner was an adult when he entered the United States. Respondents therefore may not rely on the Form G-166C as the basis for Petitioner's continued detention as an adult. However, this Court emphasizes the limits of this conclusion. This Court does not determine Petitioner's age. Nor does it conclude that ICE ERO must credit Petitioner's explanations, accept his documents as

authentic, or assign any particular weight to any particular piece of evidence. An age determination that complies with the requirements set forth in Section 1232(b)(4) and the applicable procedures may reach the same conclusion that the Form G-166C did. See Y.A.A. 9/22 Order, 2026 WL 2851655, at *3; cf. Mohamed v. LaRose, Case No.: 26cv0955 DMS MMP, 2026 WL 1737007, at *1 (S.D. Cal. June 16, 2026) (concluding that the district court's prior order did not prevent the respondents from returning the petitioner to ICE custody after ORR's formal determination that the petitioner was not a minor). This Court decides only that the determination presently before it does not satisfy those requirements.

## III. Ruling

Because Respondents failed to comply with Section 1232(b)(4) and the ORR Guide, Respondents may not rely on the Form G-166C, or on the May 7, 2026 reprocessing of Petitioner as an adult, as a basis for detaining Petitioner as an adult.

Petitioner's request to be immediately released to his proposed sponsor is denied without prejudice. That relief would require this Court to determine that Petitioner was a minor when he was first detained. The present record does not permit this Court to make that determination. See *supra* Discussion Section II.B. For the same reason, Petitioner's claim under the Flores Settlement Agreement is denied without prejudice. The Flores Settlement Agreement applies to minors. See Y.A.A. 6/30 Order, 2026 WL 1881585, at *8 (citing Flores et al. v. Johnson et al., Case No. CV 85-4544-RJK(Px) (C.D. Cal.), Plaintiffs' First Set of Exhibits in Support of Motion for Class-Wide Enforcement of Settlement [Part 1: Exhibits 1-6], filed 2/2/15 (dkt. no. 101), Exh. 1 (Stipulated Settlement Agreement, last dated 1/13/97) at § I.4). In the instant Order, this Court does not determine whether Petitioner is a minor.

Petitioner's alternative request for transfer to ORR custody is granted. Respondents have not identified a valid basis for detaining Petitioner as an adult. A court entertaining a habeas petition "shall . . . dispose of the matter as law and justice require."

28 U.S.C. § 2243. Respondents are therefore ordered to coordinate with HHS to transfer Petitioner to the custody of ORR for an appropriate interim placement within **seven business days** of the filing of this Order. This Court does not direct the details of Petitioner's placement, which are governed by Section 1232(c) and ORR's procedures. Respondents shall file a notice of compliance within **three business days** of Petitioner's transfer. If Petitioner has not been transferred to ORR custody within **seven business days** of the filing of this Order, Respondents shall show cause why Petitioner should not be released to an appropriate least restrictive setting pending completion of a compliant age re-determination. Petitioner's request for an order prohibiting Respondents from detaining him in adult custody is granted to the extent set forth in this Order and is otherwise denied.

Petitioner has also requested that this Court award him attorney's fees and costs. See Petition at pg. 35. This Court will consider an application for reasonable attorney's fees and costs that is filed within thirty days of the entry of judgment. Petitioner's request for attorney's fees and costs is therefore denied without prejudice.[13]

Finally, because this Court resolves the Petition on the existing record, the requests in the 9/16 Supplement for leave to supplement the Petition and to conduct limited discovery are denied as moot.

## CONCLUSION

For the foregoing reasons, Petitioner S.R.I.'s Petition for Writ of Habeas Corpus, filed August 7, 2026, is GRANTED IN PART AND DENIED IN PART.

The Petition is GRANTED insofar as Respondents are ENJOINED from relying on the Form G-166C, or on the May 7, 2026 reprocessing of Petitioner as an

---

[13] This Court need not address Petitioner's claims arising under the APA or the Fifth Amendment, [Petition at pgs. 26-34,] because the Petition can be resolved on TVPRA and regulatory grounds.

adult, as a basis for detaining Petitioner as an adult. Respondents are ORDERED to coordinate with HHS to transfer Petitioner to the custody of ORR for an appropriate interim placement within **seven business days** of the filing of this Order. Respondents shall file a notice of compliance within **three business days** of Petitioner's transfer. The Petition is DENIED WITHOUT PREJUDICE in all other respects.

Respondents' request that the Petition be dismissed or, in the alternative, stayed is DENIED. The requests in Petitioner's Supplemental Brief in Support of Petition for a Writ of Habeas Corpus, filed September 16, 2026, for leave to supplement the Petition and to conduct limited discovery are DENIED AS MOOT.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, November 2, 2026.

/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
Senior U.S. District Judge

**<u>S.R.I. VS. CHRISTOPHER J. LAROSE ET AL.</u> CASE NO. 3:26-cv-04547-LEK-MMP; ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS AND DENYING AS MOOT PETITIONER'S REQUEST FOR LEAVE TO SUPPLEMENT AND FOR LIMITED DISCOVERY**